**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

Yeshivath Viznitz Dkhal Torath Chaim, and Khal
Torath Chaim of Rockland, Inc.,

                                  Plaintiffs,

      – vs. –

Village of Briarcliff Manor, Village of Briarcliff
Manor Village Board of Trustees, Steven A. Vescio
in his official capacity as Mayor of the Village of
Briarcliff Manor, Village of Briarcliff Manor Zoning
Board of Appeals, Christopher Bogart in his official
capacity as Chairman of the Zoning Board of Appeals
of the Village of Briarcliff Manor, Village of
Briarcliff Manor Planning Board, Malcolm Netburn
in his official capacity as Chairman of the Planning
Board, and David J. Turiano in his official capacity as
Building Inspector of the Village of Briarcliff Manor,

                                 Defendants.

---

Civ. Action No. 7:23-cv-4384

**Complaint**

**JURY TRIAL
DEMANDED**

---

**COMPLAINT FOR DECLARATORY JUDGMENT,
INJUNCTIVE RELIEF, AND COMPENSATORY DAMAGES**

Plaintiffs Yeshivath Viznitz Dkhal Torath Chaim ("YV"), and Khal Torath Chaim of

Rockland, Inc. ("KTC") (collectively, "Plaintiffs") by and through their undersigned counsel,

Abrams Fensterman, LLP, respectfully, allege as follows:

### NATURE OF THE ACTION

1.      Formally incorporated in 1902, defendant Village of Briarcliff Manor (the

"Village") is a lovely bucolic and richly historic community located in northern Westchester

County, New York. Abutting both the Hudson and the Pocantico waterways, its official motto

became "a village between two rivers." The Village's origins go back much farther than 1902,

though. In precolonial times, the general area was inhabited by the *Sint Sincks* native people. And

the Village itself dates to an early 19ᵗʰ century settlement, which, over time, attracted robber baron families, like the Vanderbilts, Astors, and Rockefellers.

2.     On its website, the Village boasts that among its "proudest accomplishments . . . has been its ability to carefully and creatively balance development with the preservation of open space and the Village's historic character." Sadly, that worthy achievement has now been grossly marred. Motivated by an indecent animus, the Village has thrown away those communal principles and rejected an invaluable opportunity to preserve its open space and historic *land-use* character. Instead, it has chosen to protect a very different kind of historic character, one that perpetuates exclusion based on religious practice.

3.     For more than 100 years, the Village has been home to a 37-acre campus of higher education (the "Campus"). During that period, several institutions have operated it as a residential college with classroom buildings, a library, dormitories, and dining facilities. The Campus has housed hundreds of students and has supported scores of staff and faculty members. And as the Village population grew substantially with local real estate development, the Campus effectively became an open-space preserve.

4.      In January 2017, a foreign nonprofit organization with links to the Chinese Communist Party purchased the Campus and the site then became vacant for several years.

5.     In February 2021, KTC bought the Campus and leased it to YV.  Plaintiffs intended to establish on the Campus a mixed residential and commuter school for college-aged students to study higher religious education and worship.

6.     That proposed Campus use is consistent with nearly 100 years of Village history, except for one thing. YV is an institution operated by and for Hasidic Jews.

7.      The public response to KTC's purchase of the Campus was swift and invidious. On March 10, 2021, the River Journal published an article entitled: "Former Pace Campus Future Unclear After Sale to Rockland Congregation." *See* https://riverjournalonline.com/business/former-pace-campus-in-briarcliff-sold-to-rockland-based-congregation/23359. The opening line of the story betrays its predictive bias: "Briarcliff Manor residents and officials are waiting for the other shoe to drop after learning the former Pace University campus has been sold to a Monsey religious congregation linked to the controversial purchase of another campus across the river."

8.      Public comments to the article posted on the River Journal's website were ugly, revealing an engrained hostility towards Plaintiffs' religious sect. Those statements include:

- "They [Hasidic Jews] have ruined several communities in Rockland County and have destroyed property values.  Briarcliff should be very wary of them."

- "Please do your research and see what has happened to areas where there is an explosive growth of the Hasidic and Ultra-Orthodox – public schools going bankrupt (East Ramapo School District) irresponsible and unregulated overdevelopment and deteriorating infrastructures, heavy reliance on government assistance, blockbusting by Orthodox real estate agents in developments so all homes owned by non-Jews can be sold to the Orthodox only and many other issues. . . .  The people of Briarcliff Manor have every reason to be concerned. . . . [J]ust wait until you see what can happen to Briarcliff Manor once the Hasidics move [i]n."

- "The Hasidic community has taken over my family's neighborhood in Washingtonville. They will take over if we allow them. They have seats on the school board where None [o]f their kids go to school."

9.      Those comments were a prelude for many unlawful things to come. Over the next two years, the Village subjected Plaintiffs to a costly and clumsy performance of kabuki government. Through pretextual legislation and numerous pre-determined administrative proceedings, the Village barred Plaintiffs from opening their religious school.

10.     Its discriminatory actions were not subtle. Almost immediately after Plaintiffs informed the Village of their intention to open a religious school, the Village changed its zoning code specifically to preclude Plaintiffs from using the Campus to do so. Before that amendment, however, the code expressly *permitted* Plaintiffs' proposed use. The temporal proximity between Plaintiffs' announcement and the Campus rezoning is anything but coincidental.

11.     Thereafter, Plaintiffs sought administrative relief from the Village by applying for a special exception use permit or a zoning variance. After almost two years of professionally calculated bad faith, the Village rejected a sound construction of the code that would have supported the issuance of a permit. It also reached the absurd conclusion that it lacked any jurisdiction to grant a variance.

12.     The time for subterfuge is now done. For far too long, the Village has denied Plaintiffs their fundamental right under Federal and New York State law to practice their faith unburdened by governmental discrimination. The Village has trampled on Plaintiffs' right to equal protection of the law, as guaranteed by the Fourteenth Amendment of the U.S. Constitution.  And the Village has similarly violated Plaintiffs' rights under the Federal Fair Housing Act.

13.     The Village's ham-fisted methods have not only irreparably harmed Plaintiffs for nearly two years by suppressing their religious liberty, but they have also inflicted on Plaintiffs serious economic damage. Plaintiffs, in good faith, expended substantial resources on professional consultants and attorneys to comply with the Village's permitting requirements, only to learn that the Village had run them through a bogus exercise. And while the Village has held the Campus hostage to a predetermined and multi-year administrative process, Plaintiffs have also lost substantial revenue and have incurred enormous expenses. Those are lost funds that Plaintiffs would have used to support future religious education and observance on the Campus.

14.     Plaintiffs therefore bring this action for a declaratory judgment, injunctive relief, and compensatory damages to vindicate their precious constitutional and statutory rights to religious freedom.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to: (1) 28 U.S.C. § 1331 (General Federal Question Jurisdiction); (2) 42 U.S.C. §§ 1983, 1988 (Civil Action for Deprivation of Rights and attorneys' fees); (3) U.S. Constitution, Amendments I & XIV;  (4) 42 U.S.C. § 2000cc, *et seq.* (Religious Land Use and Institutionalized Persons Act ["RLUIPA"]); and (5) 42 U.S.C. § 3601 *et seq.* (Fair Housing Act ["FHA"]). This Court has Supplemental Jurisdiction over New York State Constitutional claims pursuant to 28 U.S.C. § 1367(a) (Supplemental Jurisdiction).

16.     Venue is properly laid in this District pursuant to 28 U.S.C. §1391(b) because all events giving rise to the claims in this complaint occurred in this District and all Defendants are subject to personal jurisdiction in this District.

## THE PARTIES

17.     YV is a religious educational institution accredited by the Association of Advanced Rabbinical and Talmudic Schools. It leases the Campus from KTC. The Campus is comprised of a 37-acre parcel located at 235 Elm Road, Briarcliff Manor, New York, and YV has its principal place of business there. YV offers its students an undergraduate degree in Talmudic and Rabbinical studies.

18.     KTC is a religious corporation organized under the laws of New York State and has a principal place of business at 15 Elyon Road, Monsey, New York.  KTC is the owner of the Campus.

19.     The Village is a suburban community and governmental unit located in Westchester County, New York.  It was incorporated under the laws of New York State and has a governmental office at 1111 Pleasantville Road, Village of Briarcliff Manor, New York 10510.  All actions taken by the Village against Plaintiffs were taken under color of state law.

20.     Defendant Village of Briarcliff Manor Village Board of Trustees ("Village Board") is the governing legislative body of the Village of Briarcliff Manor and has a governmental office at 1111 Pleasantville Road, Village of Briarcliff Manor, New York 10510.  All actions taken by the Village Board against Plaintiffs were taken under color of state law.

21.     Defendant Steven A. Vescio is the Mayor of the Village of Briarcliff Manor ("Vescio") and has a governmental office at 1111 Pleasantville Road, Village of Briarcliff Manor, New York 10510. Vescio is sued in his official capacity. All actions taken by Vescio against Plaintiffs were taken under color of state law.

22.     Defendant Village of Briarcliff Manor Zoning Board of Appeals ("ZBA") is the duly appointed body that is authorized under Village Code of the Village of Briarcliff Manor ("Village Code") § 220-17 A & B and New York State Village Law ("Village Law") §§ 7-712, 7-712-a, and 7-712-b to review any order, requirement, interpretation, determination, or decision made by the Village Building Inspector. The ZBA is composed of Chairman Christopher Bogart, and members Nicholas Moraglia, Wayne Edwards, Conor Savage, Tracey Daniels O'Connell, and James Rinzler. It has a governmental office at 1111 Pleasantville Road, Village of Briarcliff

Manor, New York 10510.  All actions taken by the ZBA against Plaintiffs were taken under color of state law.

23.     Defendant Christopher Bogart is the ZBA Chairman ("Bogart") and has a governmental office at 1111 Pleasantville Road, Village of Briarcliff Manor, New York 10510. He is sued in his official capacity.  All actions taken by Bogart against Plaintiffs were taken under color of state law.

24.     Defendant Village of Briarcliff Manor Planning Board ("Planning Board") is a duly authorized Board, which serves in an advisory capacity to the Village Board regarding applications for special exception use permits, and is also responsible for site plan and subdivision plan permits and approvals. It has a governmental office at 1111 Pleasantville Road, Village of Briarcliff Manor, New York 10510. All actions taken by the Planning Board against Plaintiffs were taken under color of state law.

25.     Defendant David J. Turiano is the Building Inspector of the Village of Briarcliff Manor ("Turiano") and has a governmental office at 1111 Pleasantville Road, Village of Briarcliff Manor, New York 10510. Turiano is sued in his official capacity. All actions taken by Turiano against Plaintiffs were taken under color of state law.

26.     The Village, the Village Board, Vecsio, the ZBA, Bogart, the Planning Board, and Turiano are collectively referred to as the "Village Defendants."

## FACTUAL ALLEGATIONS

### I.     History of the Campus

27.     The Campus was originally established in 1905 when Walter W. Law, the Village's founder, donated 35 acres of land and a building located at 235 Elm Road to Mrs. Dow's School

for Girls.  In 1933, the school became a junior college and remained as such until 1957.  Beginning in 1956, however, the school, which was by then named Briarcliff College, began granting four-year bachelor's degrees. Briarcliff College expanded and operated on the Campus until 1977. At the height of its enrollment, the institution had over 600 students.

28.     In 1977, Pace University bought the Campus. The following year, the Village granted Pace a special exception use permit to develop the Campus more extensively. The permit authorized an increase in academic operations, onsite housing and enrollment for up to 700 residential students. It further authorized the enrollment of 400 commuter students. The total permitted Pace enrollment of 1,100 students, then, was an approximately 45% increase over the Briarcliff College enrollment. Under Pace's stewardship, the Campus grew to encompass nine buildings, including classrooms, a library, dormitories, dining quarters, and athletic facilities.

29.     Pace sold the Campus in 2017 to the Research Center on Natural Conservation, Inc. ("RCNC"), a China-based nonprofit organization that supposedly hosts conferences on global warming and conservation. RCNC is reportedly controlled by a former delegate to the Chinese People's Political Conservative Conference – an organization formed by the Chinese Communist Party.  *See*   https://tennesseestar.com/news/chinese-communist-party-linked-companies-are-purchasing-u-s-military-academies-florida-congressman-warns/jtnews/2023/02/03/. From 2017 to 2021, RCNC left the Campus unused and vacant.

30.     KTC bought the Campus from RCNC in March 2021, and leased it to YV to operate a religious school and place of worship for college-aged students.

31.     As planned, YV will initially enroll approximately 250 college-aged students. Thereafter, the institution's expected growth rate is approximately 3% per year. Thus, within the first ten years of religious instruction, YV's anticipated enrollment should be around 350

college-aged students. Of that total student population, some 315 are expected to live on the premises, while the balance of students and various faculty and staff members will commute daily to the Campus.

32.     Notably, YV's anticipated enrollment *after 10 years* is only around *31%* of what the Village previously permitted when Pace owned the Campus.

## II.     The Village Employed Blatantly Pretextual Zoning Determinations to Bar Plaintiffs from Using the Campus as a "Place of Worship"

### a.   *The Campus Satisfies Village Zoning Requirements as a Place of Worship*

33.     The Campus is located within the Village's R-40-B residential zoning district ("R-40-B Zone"). As a residential zoning district, the R-40-B Zone is generally limited to the development of single-family dwellings, parks, playgrounds, structures and buildings of a municipality or government, public libraries, including municipality-operated parking lots. *See* Village Code, Chapter 220, Schedule pp. 1-2.

34.     Under the Village's zoning rules, however, a "Place of Worship" can also be located within the R-40-B Zone, provided that the Village issues a special exception use permit. *See* Village Code § 220-6(J)(a). The Village Board has final authority to approve a special exception use permit for that purpose. *See* Village Code § 220-6(C). In all events, the Village has the legal authority to grant a zoning variance to locate a Place of Worship within the R-40-B Zone even if it would not otherwise qualify for a special exception use permit. *See* Village Code § 220-17(B).

35.     The Village Code defines a "Place of Worship" to include structures where people "come to perform acts of devotion, veneration, or religious study."  Village Code § 220-2.

36.     Plaintiffs bought the Campus to use as a Place of Worship.

### b. The Village Changed the Zoning Rules Specifically to Discriminate Against Plaintiffs Based on their Religious Practices

37.     On December 15, 2020, the Village enacted Local Law 01-2021, which comprehensively updated Village Code § 220-6.

38.     Despite its overhaul of the Village's zoning rules, Local Law 01-2021 continued to allow Places of Worship in the R-40-B Zone pursuant to a special exception use permit.

39.     Importantly, the newly enacted law contained *no* road frontage or access requirements that would have precluded Plaintiffs from receiving a special exception use permit to operate the Campus as a Place of Worship.

40.     Thus, when KTC purchased and YV leased the Campus in February 2021, there was *no* land-use condition or restriction that prevented Plaintiffs from using the Campus under a special exception use permit as a Place of Worship. Indeed, Plaintiffs were advised by counsel that, because the Village Code continued to recognize a Place of Worship as a special exception use within the R-40-B Zone *after* its recent revision by Local Law 01-2021, the Village had confirmed that such a use was in harmony with the general zoning plan and would not adversely affect the surrounding neighborhoods or the character of surrounding properties.

41.     On March 25, 2021, a month after Plaintiffs acquired the Campus, Plaintiffs (along with their attorney and architect) attended a virtual meeting with Village staff members and their consultants to discuss Plaintiffs' proposed use of the property. During that meeting, the Village staff made no mention of any further amendments to Village Code § 220-6.  Following the meeting, Plaintiffs assembled a team of attorneys, environmental specialists, and planning and engineering

consultants to prepare the necessary applications for Village environmental, site plan, and special exception use permit approvals.

42.     Word of Plaintiffs' impending arrival in the Village apparently spread quickly. It took practically no time for the municipal backlash to start. On April 6, 2021, within 12 days of Plaintiffs' first meeting with Village staff, the Village Board announced at a public meeting that it would consider additional amendments to Village Code § 220-6 and scheduled a public hearing on those amendments for its meeting on April 20, 2021.

43.     On April 15, 2021, the Village published a public notice for that hearing. But even though Village staff was fully aware of the Plaintiffs' forthcoming application for a special exception use permit, the Village made no direct attempt to advise Plaintiffs of the proceedings.

44.     At the April 20 public meeting, the Village Board proposed further changes to Village Code § 220-6, which imposed new road access and frontage requirements as conditions for special exception use permits in the R-40-B Zone. Those newly proposed amendments, for the first time, required primary access from and no less than 200 feet of frontage on a "collector road."

45.     The U.S. Department of Transportation, Federal Highway Administration ("Federal Highway Administration") defines a "collector road" as a roadway with an annual average daily traffic (AADT) of between 1100-6300 vehicles. *See* U.S. Department of Transportation, Federal Highway Administration, *Highway Functional Classification Concepts, Criteria and Procedures*, Table 3-6; https://www.fhwa.dot.gov/planning/processes/statewide/related/highway_functional_classifications/section03.cfm.

46.     The Campus has primary access from and approximately 691.5 feet of frontage on Elm Road. Plaintiffs' traffic and engineering consultants calculated the average AADT on Elm Road to be 2,578 vehicles, confirming that Elm Road is a "collector road" under the U.S. Federal Highway Administration's definition.

47.     And, notably, the Village's Comprehensive Plan ("Comprehensive Plan") has also designated the entirety of Elm Road as a "collector road." *See* Comprehensive Plan § 2.5.2.

48.     Because the Campus had the requisite access from and frontage on a "collector road," the Village Board's proposed change to Village Code § 220-6 would not have affected Plaintiffs' eligibility for a special exception use permit to operate a "Place of Worship." That the draft amendment therefore missed its intended mark soon became obvious.

49.     Even though there was no discussion during the Village Board's April 20 meeting about any additional changes to the draft amendment, the Village Board introduced further revisions on May 4, 2021. Again, the Village gave no indication to Plaintiffs that critical modifications to Village Code § 220-6 were under serious consideration.

50.     The Village's lack of transparency with Plaintiffs was fully consistent with its improper motive. The May 4, 2021 version of the proposed changes was a surgical strike with a particularly anti-Hasidic impact. Although the new draft likewise required access from and frontage on a "collector road," it now explicitly directed that the term "collector road" be applied "as defined by the NYS Department of Transportation" ("DOT"). *See* Local Law 9-2021. But because DOT does not *"define"* roads, it *"classifies"* them, the revised text of the access and frontage requirement was somewhat confusing.

51.     Regardless of its ambiguity, the draft's new specificity was neither random nor unconnected to the Campus. Depending on location, DOT classifies Elm Road as either a "Class 17 – Major Collector Road" or a "Class 19 – Urban Local Roadway." *See* New York Department of Transportation, *Highway Design Manual*, Ch. 2, § 2.4, Exhibit 2-1. The Campus, of course, fronts on a small portion of Elm Road that DOT classifies as a Class 19 – Urban Local Roadway. Within less than a mile from the Campus, however, Elm Road transitions into a Class 17 – Major Collector Road.

52.     Although the decision to exclude Hasidic Jews from the Village was an act of naked bigotry, the Village Board believed it had sewn a fig leaf. By changing Village Code § 220-6 to condition the necessary special exception use permit upon the property having access and frontage on a "collector road," as that term is "defined" by DOT, the Village Board stitched together a pretext to ensure that Plaintiffs' Place of Worship never opened.

53.     Both the U.S. FHA *and the Village's own Comprehensive Plan* confirm that the Campus fronts on a collector road. But by rejecting those designations – and instead adopting DOT's *partial* classification of Elm Road as a Major Collector Road – the Village could insist otherwise. And if the Campus did not have primary access from and 200 feet of frontage on a collector road, the Village could rely on its newly minted version of Village Code § 220-6 to deny Plaintiffs' request for a special exception use permit.  Problem solved.

54.     On June 15, 2021, the Village Board enacted Local Law 9-2021, which amended Village Code § 220-6 to include a new access and frontage requirement that incorporated DOT's road classifications. Local Law 9-2021 was filed with the NYS Department of State and became effective on June 23, 2021.

55.     Fear is an accelerant and the Village worked with lighting speed. In less than *three months*, it stripped the Campus of a use that had been permitted to other, larger, non-Hasidic educational institutions for over *100 years*.

### c.     The Village Predictably Denied Plaintiffs' Requests for A Special Exception Use Permit and a Zoning Variance

56.     On June 18, 2021, Plaintiffs submitted a completed application for a special exception use permit to the Village Board ("Permit Application") and a site plan application to the Planning Board (collectively, the "Applications").

57.     Over the next eleven months, and at Plaintiff's great cost and delay, KTC and YV prosecuted the Applications in good faith. They hired legal, environmental, planning, architectural, safety, engineering, and traffic consultants both to provide the Village and Planning Boards (and their own consultants) with requested information and to respond to any questions or concerns expressed during the consultative review process. During that process, Plaintiffs supplemented the Applications with voluminous submissions, including numerous expert drawings, plans, studies, reports, and legal memoranda addressing multiple land-use issues. *See* https://www.briarcliffmanor.gov/mayor-board-trustees/pages/235-elm-road;

https://www.briarcliffmanor.gov/zoning-board-appeals/pages/yeshivath-viznitz-235-elm-road.

58.     On May 3, 2022, the Village Board deemed the Permit Application complete. Nevertheless, the consultative process between Plaintiffs and the Village continued through September 2022, with Plaintiffs making numerous additional submissions in response to issues raised by Village consultants.

59.     But the entire application process was an outrageously expensive sham, intended by the Village to erect a façade of good faith. In fact, the Village Board's orchestrated review of

the Permit Application was a bad faith effort to delay and ultimately block Plaintiffs' exercise of religious liberty.

60.     On September 20, 2022, the Village's planning consultant issued a memorandum that contained the first reference made by any Village official or consultant during their review of the Applications to the new access and frontage requirement contained in Village Code § 220-6 adopted on June 15, 2021 and effective as of June 23, 2021.

61.     Not long after, on November 4, 2022, the Village's traffic consultant issued a report concluding that Plaintiffs do *not* comply with those access and frontage requirements. In perfect coordination, Turiano, the Village's Building Inspector, that same day issued a formal determination that the Campus did *not* comply with Village Code § 220-6, as recently amended. That determination left Plaintiffs ineligible for a special exception use permit to maintain a Place of Worship.

62.     Following Turiano's November 4, 2022 determination, Plaintiffs requested that the Village Board exercise its authority under Village Law § 7-725-6 (5) to waive the prohibitive access and frontage requirements, including in correspondence to the Village Board dated November 15, 2022 and February 1, 2023.

63.     The Village Board, intending all along to exclude Plaintiffs from the Village, had specifically hired special RLUIPA counsel ("RLUIPA Counsel") early in the administrative process to advise its members on how best to dispose of the Permit Application in the least inculpatory way. On November 28, 2022, RLUIPA Counsel and the Village's attorney informed Plaintiffs by letter that the Village Board did not have the power under Village Law § 7-725-b (5) to waive the frontage requirements.

64.     Consequently, Turiano's November 4, 2022, determination constituted a formal denial of the Permit Application, leaving Plaintiffs barred from using the Campus as a Place of Worship.

65.     That determination states that Plaintiffs "may appeal my decision through the Zoning Board of Appeals by following procedure outlined in Chapter 220-18 of the Code of the Village of Briarcliff Manor." The determination was also accompanied by a letter from RLUIPA Counsel and the Village attorney reiterating that Plaintiffs "may appeal this matter to the Village's Zoning Board of Appeals." The letter from the Village's lawyers also added that such an appeal or the issuance of the November 4, 2022 determination "does not necessarily require the Village Board to halt its review of the [special exception use application]" and that the Village Board could continue and complete its review of the special exception use permit application while an appeal to the Zoning Board of Appeals is pending.

66.     On November 21, 2022, Plaintiffs appealed Turiano's interpretation of the Village Code § 220-6 to the ZBA, which is empowered by both New York State and Village law to review the Village Building Inspector's interpretation of that provision. In the alternative, Plaintiffs requested that the ZBA grant them a zoning variance that would allow them to use the Campus as a Place of Worship.

67.     Among other things, Plaintiffs argued to the ZBA that the frontage requirement in Village Code § 220-6 is ambiguous and that Turiano misinterpreted it.  Plaintiffs also maintained that, in any event, the proposed use of the Campus satisfied all requirements for a variance.

68.     Meanwhile, the Village Board refused to continue processing the special exception use permit application despite the policy elucidated in the correspondence accompanying the November 4, 2022 determination.

69.     On April 23, 2023, the ZBA rejected Plaintiffs' appeal and affirmed Turiano's interpretation of Village Code § 220-6. And contrary to controlling statutory and judicial authority, the ZBA concluded that it did not have jurisdiction to consider the requested variance.

70.     At least when it comes to Hasidic Jews, neither the Village Board nor the ZBA apparently has authority to grant a zoning variance or waiver. That coordinated legal position is ridiculous. It is no more than the Village's transparent attempt to sidestep a fact-intensive variance determination, for which the Village would have had to balance *openly* many competing social and community interests. The Village's claimed jurisdictional constraints were thus a feeble effort to leave religious prejudice in the shadows. Those efforts failed miserably. Instead, they threw a bright light on the truly invidious bias at work here. One would think that RLUIPA Counsel could do better.

### III.    The Harassing Building Code Violations Received By Plaintiffs Further Underscore the Religious Animus Motivating the Village

71.     From sometime in 2017 to March 2021, the Campus was owned by RCNC – a Chinese Communist front organization. During that entire period, the Campus remained unoccupied, and all its buildings stood vacant.

72.     In June and July 2018, Turiano directed that RCNC test the Campus fire alarm system and, on April 4, 2019, issued certificates of occupancy for the premises. Upon information and belief, the Village did not otherwise issue any zoning or building violations against RCNC.

73.     Before it bought the Campus in March 2021, KTC secured a title report for the Campus, which included a report of any outstanding municipal violations filed against the property. The report indicated that there were no outstanding municipal violations.

74.     After KTC purchased the Campus, which remained unoccupied, the Village launched a series of Campus inspections that resulted in KTC receiving numerous building code violations. Among other infractions, the code violations included a broken lock, tardy snow removal, a fire alarm system in need of replacement, and a storm drain in need of repair.

75.     Plaintiffs repeatedly requested meetings with the Village to discuss which repairs to the vacant buildings were immediately necessary and which could await their receipt of the special use permit so that they could integrate those repairs into the overall Campus renovation. At first, the Village failed to respond to Plaintiffs' requests to meet.

76.     Thereafter, Plaintiffs received a summons to appear in Village Court on April 4, 2023, which they did. The proceedings were adjourned. On May 3, 2023, Plaintiffs again had to appear in court and submit a written "intention to cure" the outstanding citations. The Village proposed the full penalty authorized by law, $250 per violation, per day. In all, for the nine Campus violations cited, the Village has concluded that Plaintiffs – sponsors of Hasidic religious and educational betterment – should pay approximately $69,000 *per month*, despite the continuing unused and uninhabited status of the property.

77.     Notably, the Village Code prohibits the issuance of a special exception use permit for a property that has outstanding building code violations. Again, the discriminatory strategy is far from subtle. The Village is plainly using excessive fines as another cudgel to force Plaintiffs off the Campus and to abandon their plans for a Place of Worship in the "village between two rivers."

## COUNT I

**(As Against All Village Defendants)**
**42 U.S.C. § 2000cc(a) – RLUIPA Violation – Substantial Burden**

78.    Plaintiffs repeat and reallege paragraphs 1 through 77 of this complaint as if fully set forth here.

79.    Plaintiffs acquired the Campus for the purpose of promoting the religious beliefs, education, and practices of Hasidic Jews. At the time Plaintiffs acquired the Campus, they were eligible under Village zoning laws to apply for and obtain a special exception use permit that would allow them to use the Campus as a religious school and place of worship.

80.    When the Village Defendants learned of Plaintiffs' intended use of the Campus, they purposefully, and motivated by anti-Hasidic prejudice, set out to bar Plaintiffs from establishing a religious school and place of worship.

81.     To accomplish that unlawful goal, the Village amended its zoning laws specifically to preclude Plaintiffs from receiving a special exception use permit. Specifically, the Village Board imposed certain road access and frontage requirements for the permit that the Village Board knew Plaintiffs could not satisfy.

82.    Based upon the amended provision, Turiano, the Village Building Inspector, determined that Plaintiffs were not eligible for a special exception use permit. When Plaintiffs requested that the Village Board waive the prohibitive frontage requirement so that they might obtain a special exception use permit, the Village Board arbitrarily and capriciously maintained that it did not have the legal authority to do so.

83.    When Plaintiffs appealed the Village Building Inspector's determination to the ZBA, the ZBA arbitrarily and capriciously rejected Plaintiffs' appeal and affirmed the Village

Building Inspector's interpretation of the permit provision. The ZBA similarly determined that it did not have jurisdiction to consider Plaintiffs' request for a zoning variance that would allow them to use the Campus as desired, erroneously concluding that it lacked jurisdiction to grant the requested relief.

84.     The Village has also cited Plaintiffs for a series of building code violations that are mean spirited and coercive. Imposed in bad faith, those fines are now accruing at the inconceivable rate of approximately $69,000 per month.

85.     By virtue of their conduct, the Village Defendants have intentionally utilized land-use regulations to impose a substantial burden on Plaintiffs' exercise of religious beliefs and practices. Plaintiffs are Hasidic Jews, a sect of Judaism that the Village Defendants have maliciously and meticulously sought to exclude from their community. Consequently, the burden imposed by the Village Defendants on Plaintiffs is neither in furtherance of a compelling governmental interest, nor is the least restrictive means of furthering any such interest.

## COUNT II

**(As Against All Village Defendants)**
**42 U.S.C. § 2000cc(a) – RLUIPA Violation – Equal Terms**

86.     Plaintiffs repeat and reallege paragraphs 1 through 85 of this complaint as if fully set forth here.

87.     The R-40-B Zone generally allows "structures or buildings of a municipality or government" without requiring a special exception use permit.

88.     Consequently, if a governmental agency were to buy the Campus, it would not need a special exception use permit to operate it as an educational facility, even one that housed a place of worship for its students.

89.     Because the Village requires that Plaintiffs' have a special exception use permit to use the Campus as an educational facility and place of worship, it has unlawfully implemented and imposed a land-use regulation that treats a religious institution on less than equal terms than a non-religious institution.

90.     The unequal treatment of religious institutions under the Village's land-use regulation is neither in furtherance of a compelling governmental interest, nor is the least restrictive means of furthering any such interest.

## COUNT III

**(As Against All Village Defendants)**
**42 U.S.C. § 1983 – U.S. Constitution, First & Fourteenth Amendment Violations –**
**Free Exercise of Religion**

91.     Plaintiffs repeat and reallege paragraphs 1 through 90 of this complaint as if fully set forth here.

92.     The Village Defendants intentionally discriminated against Plaintiffs because of their affiliation with Hasidic Judaism.

93.     The Village denied Plaintiffs' requests for a special exception use permit and zoning variance with the intended goal of barring them from establishing a Hasidic school of higher religious education and place of worship on the Campus.

94.     By their conduct, the Village Defendants have violated Plaintiffs' First and Fourteenth Amendment rights to exercise their religion freely and without arbitrary and invidious governmental interference.

## COUNT IV

**(As Against All Village Defendants)**
**42 U.S.C. § 1983 – U.S. Constitution, Fourteenth Amendment Violation –**
**Equal Protection**

95.     Plaintiffs repeat and reallege paragraphs 1 through 94 of this complaint as if fully set forth here.

96.     The R-40-B Zone allows for the presence of "structures or buildings of a municipality or government," including institutions of higher education, without requiring a special exception use permit.  Thus, under the Village's land-use scheme, a government agency is free from zoning constraints to operate the Campus as a residential college that maintains a place of worship for students, faculty, and staff, while Plaintiffs must comply with onerous permit requirements to do the very same thing.

97.     That difference in treatment arbitrarily frustrates Plaintiffs' fundamental right to exercise their religion freely and without invidious governmental interference.

98.     On their face, the Village's land use regulations therefore violate Plaintiffs' Fourteenth Amendment right to equal protection under the law.

## COUNT V

**(As Against All Village Defendants)**
**42 U.S.C. § 3604 – Fair Housing Act – Discrimination in Renting**

99.     Plaintiffs repeat and reallege paragraphs 1 through 98 of this complaint as if fully set forth here.

100.    The Campus contains dormitory facilities sufficient to house several hundred students, faculty, and staff.

101.    In operating the Campus as a school of higher religious education and place of worship, Plaintiffs will lease dormitory rooms to resident members of the Campus community who are Hasidic Jews.

102.    By intentionally barring Plaintiffs from using the Campus for Hasidic education and worship, the Village is necessarily discriminating against Plaintiffs for providing housing to members of the Hasidic community. In fact, depriving housing in the Village to members of the Hasidic community is among the intended goals of the Village Defendants.

103.    The Village Defendants have therefore violated Plaintiff's rights under the Fair Housing Act to rent residential facilities to individuals regardless of their religious beliefs and practices.

<u>**COUNT VI**</u>

**(As Against All Village Defendants)**
**New York State Constitution – Article 1, Section III Violation –**
**Free Exercise of Religion**

104.    Plaintiffs repeat and reallege paragraphs 1 through 103 of this complaint as if fully set forth here.

105.    The Village Defendants have deprived and continue to deprive Plaintiffs of their right to the free exercise of religion, as secured by the New York Constitution Article 1, Section III, by imposing and implementing a land use regulation that intentionally discriminates against the Plaintiffs on the basis of religion and burdens their support of Hasidic religious practices.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that this Court grant judgment to Plaintiffs:

(i)     declaring that the Village Defendants' actions regarding Plaintiffs' request to use the Campus as a religious school and place of worship violated Plaintiffs' rights to religious liberty and equality, as protected by RLUIPA, the Free Exercise and Equal Protection clauses of the United States Constitution, the FHA, and the New York State Constitution;

(ii)     enjoining the Village Defendants from violating Plaintiffs' statutory and constitutional rights in determining their application for a special exception use permit to maintain and operate the Campus as a school of higher religious education and place of worship;

(iii)    awarding compensatory damages to be determined at trial for the economic losses sustained by Plaintiffs as a result of the Village Defendants' unlawful conduct;

(iv)    awarding Plaintiffs costs and attorneys' fees as permitted by law; and

(vi)    granting such other and further relief as the Court deems just and proper.


Respectfully submitted this 25th day of May, 2023

                              ABRAMS FENSTERMAN, LLP
                              *Attorneys for Plaintiffs*

By: _____
                           Albert J. Pirro, Jr.
                        Jeffrey A. Cohen, of counsel
                        81 Main Street, Suite 400
                        White Plains, New York 10601
                              (914) 607-7010

24